JEFFERIES *v.* FIRST NATIONAL BANK OF LAUREL.

In Banc. Dec. 31, 1948.

(38 So. (2d) 98)

Robertson & Robertson, and Collins & Collins, for appellants.

**Beard & Pack,** for appellee.

**Roberds, J.**

On September 23, 1943, Joseph H. Walker, a resident citizen of the City of Laurel, Jones County, Mississippi, executed a last will and testament. He died November 19, 1943. His will was duly admitted to probate in said County. He nominated as executor and trustee The First National Bank of Laurel. The Bank qualified as executor and took charge of the estate. The estate aggregated near three hundred thousand dollars. Appraisers were

appointed and made appraisal. An inventory was duly made and filed. Both the appraisal and inventory were approved by the Chancellor. Among the assets was a wholesale grocery business located in Laurel, owned and operated exclusively by Mr. Walker. The physical assets of that business consisted of the building, the leased land on which the building was located, the stock of merchandise, accounts and bills receivable, transportation equipment and fixtures and furniture in the building. The executor determined it was to the best interest of all parties to sell that business. It did sell it at private sale, under sealed bids, December 1, 1944. The sale was approved by the Chancellor. The executor filed an annual account, which was duly approved.

The will provided for bequests of two thousand dollars each to two married daughters and two adult sons of testator. It then made provision for the wife for her life, or during widowhood, and for education and support of Nancy, a minor child, remainder to his heirs at law. The will vested in the Executor and Trustee certain specific powers, those pertinent to the issues here involved being hereinafter noted.

In March, 1945, the Executor filed its final account. Mrs. Christine Jefferies Walker, the widow, for herself and said minor, filed objections and exceptions to that account, and asked for its disapproval and for removal of the Trustee. The Chancellor overruled the objections and refused to remove the Trustee. From that action the widow and minor appeal here.

There are twenty-two objections. The record and briefs constitute some seven hundred pages. We need not in this opinion detail each objection. We pass upon all of them but discuss only those sufficiently serious to require discussion.

Objectors say it was an abuse of discretion to sell, and not operate, the business. The will contains these provisions:

"My Executor and Trustee is hereby specifically authorized, empowered and so directed to liquidate or sell my business known as The Laurel Wholesale Grocery Company, said liquidation or sale to be done in an orderly manner and as soon after my death as in the discretion of said Executor and Trustee may be practicable and to the best interest of the conservation of my estate. This authority shall include the authority to continue the operation of the business for so long as may be necessary to sell or liquidate the same in an orderly manner and to the best interest of my estate."

"I hereby nominate, constitute and appoint the First National Bank of Laurel, a banking corporation of Laurel, Mississippi, my Executor and Trustee of this my Last Will and Testament. In all cases in which the Bank's action involves discretion, I direct that its decision be that of its Board of Directors."

 The record discloses that the directors fully discussed among themselves, and with others, the advisability of selling or continuing to operate the business. They were aware of the risks of operations. Mr. Walker, it is shown, was a good business man and a dynamic personality. He, in effect, was the Laurel Wholesale Grocery Company. Its success was due primarily to him. This country was in a world war. No suitable person to take this place was obtainable to the knowledge of the Executor. Certain kinds of merchandise were difficult, if not impossible, to obtain to replenish the stock. Priorities existed. Great uncertainty prevailed in the business field. It appeared that a good sale of the business could be had. Other reasons supporting the advisability of sale could be mentioned. In addition to this, objectors showed no certainty of profit from operations, or a better sale later after an attempt at continuation of the business. It cannot be said that any idea of personal gain entered into the decision of the Executor to sell, for it is evident that the fees for its services would have been greater from operation and later sale than from non-operation and immediate

sale. Indeed, had the Executor, under the existing precarious conditions, tried to operate the business and loss had resulted, liability for such loss would have presented a serious question. We cannot say their decision to sell under the circumstances was not the act of an ordinarily prudent business man.

 ██ Appellants say the sale was not sufficiently advertised. The Executor asked for separate bids on each of five classes—merchandise, furniture and fixtures, five trucks, the building and lease, and notes and accounts receivable—and also a lump-sum bid. It required a cash deposit of five per cent of the amount offered to accompany each bid and reserved the right to reject any and all bids. It specified the inventory could be examined by prospective purchasers and the acceptance of a bid by the Executor was subject to confirmation by the Chancery Court. Publication, containing the enumerated elements, was made in the Laurel paper November 24th to 30th, and in the Jackson Daily News, Jackson, Mississippi, November 27th to November 29th, and in the Hattiesburg American November 29th to December 1st, all dates being inclusive. The Bank directors by personal interviews and telephone conversations personally contacted many prospective bidders and wrote a number of letters to wholesale grocery dealers in Mississippi and other states. It is shown that many people made a thorough personal inspection and detailed investigation of all of the assets, including the books and invoices, and records of the Company, as well as the inventory and appraisal and were given all the information possessed by the directors and officers of the Bank and those the Bank had placed in charge and who were present at the place of business. There were four separate class-lump-sum bids, and a number of bids upon some, but not all, of the enumerated five classes, without a lump-sum bid. Of the four combined separate-lump sum bids the lowest total was $87,138.74, and the highest was $131,897.43. The next highest was $120,250. In the highest bid the total of

values of the separate classes aggregated $121,508. Nowhere in appellants' brief is it pointed out that there is any proof which amounts to more than possibility or speculation that had the sale not been made on December 1st, but had been postponed for ten or twenty days later, there would have been any higher, or more numerous, bids on the later date. And suppose that on the postponed day the highest bid had been $10,000 less than the high bid of December 1st, and the Executor, seeing no prospect of a later higher bid, had accepted the ten thousand dollar loss bid, this suit, no doubt, would have demanded a decree against the Executor for that loss. Liability cannot stand upon mere possibility or speculation. We do not think this objection is well taken, and a sufficient answer to the question is that under the terms of the will no public notice of the proposed sale was required to be given.

It is next said that the wholesale grocery property should have brought more than the foregoing highest total bid of $131,897.43. That contention is based mainly upon the price bid for the building, the accounts receivable and the question of the value of the good will of the business. As to the building, it was constructed in 1931 at a cost of $18,000. Since then a new roof, a sprinkler and cold storage system had been added. The appraisers valued the building at $16,000. The price bid for it was $20,000 as a separate item. Some witnesses for objectors thought the building was worth from thirty-five thousand to fifty thousand dollars. A number for the Executor valued it at $15,000. It was pointed out the building was situated upon leased property, terminable upon sixty days notice by the lessor, and which lease contains certain restrictive provisions about the use of the premises, and obligations on lessee profitable to lessor to continue as long as lessor permits the relation to exist. Witnesses, who themselves were engaged in the wholesale grocery business and familiar with appropriate housing facilities for that business, testified that this building was not of

the shape or size most suitable for the wholesale grocery business. It also appears that one side of the building was attached to a wall belonging to an adjoining owner —all of which, in connection with the fact that the building was located on leased property, detracted from the value.

As to the accounts receivable, the book value thereof totaled $38,109.28. The appraisers valued them at $35,000. The bid for them was $21,500 as a separate item. There were some fifteen hundred accounts. Witnesses engaged in the same business, and who knew over ninety per cent of these debtors, thought the bid for that item somewhat less than the true value considered alone as one item, but the total bid, including that item, was considerably more than the total worth.

There was much speculation as to the elements of good will and its value. An auditor from New Orleans, unfamiliar with the actual local conditions, theorizes on that value based on recent profits and placed a high value on it. Other witnesses, familiar with local conditions, said it was worth very little or nothing, for the reasons (1) Mr. Walker was the force behind the business, and that force passed with his passing, and (2) the future success would depend upon the person who operated the business, and upon the quality of the goods and prices that concern might offer to purchasers as compared with the goods and prices of competitors. Under the circumstances several witnesses placed no value whatever on so-called good will. It is noted the successful bidder added ten thousand dollars to his overall bid, as compared to the aggregate of his bid by items, which ten thousand dollars was evidently to cover the value of a going concern, or the good will, whichever it might be termed.

The actual cost of the stock of merchandise was $79,607.96. It was appraised at $75,000. There was ample proof this was a fair value. The bid on this as a separate item was $74,000.

The five trucks were appraised at $2,250. That was the maximum of the Government ceiling price on these trucks. The bid on them as a separate item was $4,000.

And as an overall proposition the total of the successful bid was $811.57 over the total appraised value. The advantage of selling the business as an entirety is obvious. For instance, no person would desire the business if another owns separately the bills and accounts receivable. The future success of the business depended largely upon the good will of these very customers. Whether that good will continued depended largely upon the manner of handling the collection of these accounts. A separate owner of such accounts would have had to a very great extent the power to retain or alienate that good will. The business could not successfully be divided into different parts and each part sold to separate persons.

The Chancellor had ample evidence to support his confirmation of this sale. We certainly cannot say he was manifestly wrong, especially since it is not pointed out by what means or manner a higher price could have been obtained for the foregoing assets of the estate nor in what respect the beneficiaries in the will suffered any loss.

The sale was made without legal citation to the beneficiaries in the will, although they had actual knowledge of the intention to sell. The will relieved the Executor from legal citation to interested parties. Section 518, Code 1942.

Affirmed.